### 8862

### LINDLER v. COLUMBIA HOSPITAL.

#### (81 S. E. 512.)

ELEEMOSYNARY CORPORATIONS. CHARITIES. LIABILITY FOR NEGLIGENCE OF EMPLOYEES.

An eleemosynary corporation conducting a hospital for the care of the sick, some of whom are cared for freely, and others of whom pay fees for such care, more or less in accordance with their circumstances; all funds so received being devoted, along with gifts and bequests, to the maintenance, support, improvement and equipment of the hospital, is a public charity; and is not responsible to a patient for injuries resulting from the negligence of its servants selected with due care.

Before SEASE, J., Richland, February, 1913. Reversed.

Action by Nan Lindler against the Columbia Hospital of Richland county. The facts are stated in the opinion. The case having been argued before the Supreme Court, and the judgment below affirmed by a bare majority, the Circuit Judges were called to the assistance of the Supreme Court, which, sitting *en banc,* heard the case on 5th June, 1914.

*Messrs. Melton & Belser, Edward L. Craig* and *W. H. Cobb,* for appellant, cite: *Eleemosynary corporation not liable to beneficiary for tortious act of its servants selected with*

*due care where there was no wilfulness:* 6 Cyc. 975, 976; 7 L. R. A. 485; 34 L. R. A. (N. S.) 317; 31 L. R. A. 224; 66 Conn. 98; 118 Ga. 647; 45 S. E. 483; 218 Ill. 381; 2 L. R. A. (N. S.) 556; 104 Ky. 456; 47 S. W. 342; 11 L. R. A. (N. S.) 711; 14 L. R. A. (N. S.) 784; 63 Md. 20; 7 L. R. A. (N. S.) 481; 120 Mass. 432; 33 L. R. A. (N. S.) 141; 120 Mo. App. 675; 99 S. W. 453; 25 L. R. A. 602; 32 L. R. A. (N. S.) 65; 67 S. E. 971; 137 N. W. 1120; 41 L. R. A. (N. S.) 973; 85 Ohio 90; 39 L. R. A. (N. S.) 427; 121 Pac. 901; 227 Pa. St. 254; 11 L. R. A. (N. S.) 1179; 8 L. R. A. (N. S.) 1165; 145 S. W. 1030; 47 C. C. A. 122; 65 L. R. A. 372. *Rule not altered by patient paying:* 41 L. R. A. (N. S.) 973. *Rule for public and private charities the same:* 121 Ill. App. 512; 218 Ill. 381; 28 L. R. A. (N. S.) 556; 75 N. E. 991; 4 Ann. Cases 103; 22 L. R. A. (N. S.) 487. *Characteristics of eleemosynary or charitable corporations:* 2 L. R. A. (N. S.) 556, note; 60 Fed. 365; 9 C. C. A. 14; 13 L. R. A. 581; 120 Mass. 432. *Cases distinguished or criticized:* 128 Am. St. Rep. 358; 14 L. R. A. (N. S.) 787; 6 L. R. A. 779; 34 Am. Rep. 678; 7 L. R. A. (N. S.) 484; 59 S. E. 945.

*Mr. D. W. Robinson,* for the respondent, cites: *Is defendant a public charity:* 154 N. Y. 14; 38 L. R. A. 596, 597; 2 Words and Phrases 1075, 1076; 2 How. 146-152; 109 Fed. 204; 47 C. C. A. 122; 78 N. E. 855; 7 L. R. A. (N. S.) 482, 484; 75 Atl. 1088. *Or even an eleemosynary institution:* 4 Wheat. 633, 634, 640; 8 Wheat. 464; 113 Cal. 129; 35 L. R. A. 270. *Hospital liable for failure to exercise care:* 127 Ky. 564; 128 Am. St. Rep. 356, 358, 359; 55 L. R. A. 27; 6 L. R. A. 779, 780; 34 Am. Rep. 678, 679, 681, 683, 689, 690; 30 N. B. 279; 5 Thomp. Corp., secs. 6363, 6364, 6365; 79 Atl. 987. *Liability of eleemosynary corporations:* 77 S. C. 12; 221 U. S. 636, 646-648.

June 22, 1914.

The opinion of the Court, *en banc,* was delivered by MR. CHIEF JUSTICE GARY.

This is an action for damages alleged to have been sustained by the plaintiff, through the negligence of one of the nurses employed by the defendant, in placing the plaintiff in the bed where there were hot bottles that burnt her severely, while she was unconscious, after undergoing a surgical operaation. The jury rendered a verdict in favor of the plaintiff for $1,800, and the defendant appealed upon exceptions assigning error, on the part of his Honor, the presiding Judge, in refusing a motion to direct a verdict in favor of the defendant, on the ground that "the uncontradicted evidence shows that it was a charitable or eleemosynary institution, and, as such, is by law exempt from liability for the injury sued upon."

The rule is thus stated in 6 Cyc. 975, 976 : "A charitable corporation is not liable for injuries, resulting from the negligent or tortious acts of a servant, in the course of his employment, where such corporation has exercised due care in his selection. While this rule of law is well established, the reasons assigned for it are not uniform. Some Courts hold that the funds of a charitable corporation cannot be appropriated to payment for an injury arising from the neglect or wrongdoing of the servants; others exempt charitable corporations from liability, on the ground of public policy; still others hold that one who accepts the benefits of a charity assumes the risk of negligence."

To the same effect is the principle announced as follows in 5 Enc. of Law, 923 : "With regard to the liability of charitable corporations or their trustees, for the negligence of agents or employees, there is some difference of opinion; but the decided weight of authority denies such liability. This on two grounds: First, that if this liability were admitted, the trust fund might be wholly destroyed, and diverted from the purpose for which it was given, thus thwarting the

donor's intent as the result of negligence for which he was in nowise responsible. Second, that since the trustees cannot divert funds by their direct act, from the purpose for which they were donated, such funds cannot be indirectly diverted, by the tortious or negligent acts of the strangers of the funds or their agents or employees."

In the notes also in the argument of the appellant's attorneys, there are numerous authorities sustaining the forgoing texts.

The true ground upon which to rest the exemption from liability is that it would be against public policy to hold a charitable institution responsible for the negligence of its servants, selected with due care. But the question whether it would be liable for negligence in the selection of its servants without due care is not before the Court for consideration.

Much confusion has arisen from the effort to apply language used in some of the English and American decisions to cases in which the facts were entirely different from those in which it was used. *Adams* v. *University Hospital*, 122 Mo. App. 675, 99 S. W. 453.

We have been able to find only a single case decided by any Court in the United States in which it was held that a charitable institution was liable for the negligence of its servants when that question was involved, to wit, *Glavin* v. *R. I. Hospital*, 12 R. I. 411, 34 Am. Rep. 675, and in that case the language of the Court was broader than was warranted by the facts. After that decision was rendered the legislature of Rhode Island enacted a statute changing the rule announced by the Court.

The next question for consideration is whether the defendant is a charitable corporation. The following admission on the part of the plaintiff's attorney appears in the record: "Mr. Robinson: I do not contend it is not an eleemosynary institution; it is an eleemosynary institution under the laws of this State, the charter says that; I do take an issue about

the question of charity, whether it falls under a public charity." The petition for a charter recited that its purpose was "to conduct and carry on a hospital for the care and treatment of the sick," and in article 1 of the constitution it is stated that "its object shall be to erect and maintain a hospital at Columbia, S. C., for sick persons." The corporators were certain physicians of Columbia and a number of ladies, but the ladies afterwards resigned, and, under a resolution adopted by the association, an arrangement was made by which their places were filled by physicians; but the general purposes of the organization were to be continued of force, without material change, as will appear from section 4 of the resolution, which was as follows: "In this way all the rights, privileges, and immunities of the present organization will be preserved, its obligations of every nature whatsoever will be respected and remain unimpaired, and the hospital building and improvements will be left with the names, under which it has been fostered, through the care and zeal and self-sacrifice of the ladies." The charitable nature of the defendant is thus stated in its answer: "The defendant is not a business corporation and has no stock or stockholders, but is an eleemosynary or charitable corporation, and as such conducts a hospital in the city of Columbia, in said county and State, and holds all of its property in trust for the conduct and maintenance of the same; that said hospital is supported and maintained in part by gifts and bequests, which are and have been made to it from time to time, and in part by fees and charges paid by patients treated therein; that in the conduct of said hospital some patients are treated entirely free, and others pay more or less according to their circumstances, but all sums so received are devoted solely to the maintenance, support, improvement, and equipment of said hospital as an eleemosynary institution."

The respondent's attorney urges several reasons why the defendant cannot be regarded as a charitable institution so

as to be exempt from liability for the negligence of its servants.

In the first place, he relies upon the fact that the defendant is controlled by the physicians of Columbia, who are members of the hospital association. We have already shown that they are mere trustees for the purpose of carrying into effect the original purposes for which the hospital association was organized. They are not entitled to any part of the profits, and the only benefits they derived from the association are merely incidental to their practice. There is no common fund to be divided among the physicians, but each must look to the particular patient employing him for his fee without reference to the fees of the other physicians.

The second ground upon which the respondent relies is that the defendant is not a public charity. The defendant is a public charity, but the same principle would apply if it were a private charity. *Parks* v. *N. W. University,* 218 Ill. 381, 75 N. E. 991, 2 L. R. A. (N. S.) 556, 4 Ann. Cas. 103, and note.

The respondent next relies upon the fact that the plaintiff was a pay patient. In order to show that this proposition is untenable, it is only necessary to refer to the cases of *Jensen* v. *Maine Eye & Ear Infirmary,* 107 Me. 408, 78 Atl. 898, 33 L. R. A. (N. S.) 141, and *Duncan* v. *Nebraska Sanitarium,* 92 Neb. 162, 137 N. W. 1120; 41 L. R. A. (N. S.) 973, Ann. Cas. 1913E, 1127, in which it was held that a hospital supported mainly by charity does not lose its character as a charitable institution by the fact that it accepts compensation and makes a charge for the use of rooms to those who are able to pay for them.

The next ground upon which it is urged that the defendant should be held liable is that the hospital is a training school for nurses. This is a mere incident to the main purpose for which the association was chartered and does not destroy its charitable nature, but tends to render it more efficient. Furthermore, the question whether the defendant

exercised due care in the selection of its employees was not an issue in the case.

Lastly, it is contended that the hospital is a convenient and practical necessity and adjunct in the practice of the physicians. The respondent relies upon the case of *University of Louisville* v. *Hammock,* 32 Ky. Law Rep. 431, 106 S. W. 219, 14 L. R. A. (N. S.) 784, in which the Court used the following language: "Appellant's third contention, that it is a charitable institution, and, by reason thereof, exempt from liability for the negligence of its servants, is in conflict with more than one decision of this Court. The hospital in which appellee received the injuries complained of is an adjunct of the appellant's school of medicine, known as the 'University of Louisville,' and is maintained principally because of the advantages it affords to the students and professors of that institution. It is, however, also conducted for compensation and profit. In the main, patients received and treated at the hospital are required to compensate those in charge of it for the services rendered. This is certainly true, according to the evidence, as to patients able to pay. It is true some patients unable to pay are received and treated free of charge, but this does not show that appellant conducted a purely public charity; and, to escape liability for the wrongful acts or negligence of its servants, it should have proved that such was the character of the hospital and the use to which it is devoted." The Court then proceeds to quote the following language from the case of *Gray State Infirmary* v. *Louisville,* 65 S. W. 11, 23 Ky. Law Rep. 1274, 55 L. R. A. 270: "Dr. Grant testified that the institution would not have been established, except that the incorporators hoped to receive pecuniary advantage from it, either directly or through their connection with the college. We have no doubt from the testimony that the professors in the medical college do a great deal of charitable work in the infirmary; yet the real purpose in establishing the infirmary was to make their college more attractive to students, and to induce

attendance by reason of instruction and clinical experience, received in the infirmary, and in this way to increase the pupils of the professors operating the college. Certainly such an institution cannot be exempt from taxation, on the ground that it is purely an institution of public charity." The Court also quotes the following language from the case of *Wathen* v. *Louisville,* 85 S. W. 1195, 27 Ky. Law Rep. 635: "It is manifest from the evidence that the hospital is maintained because it is necessary to the successful conduct of the school of medicine. Without the clinical instructions and operations by the professors in the presence of the students the school could not be maintained with success. The hospital is an adjunct or a part of the medical school. Whatever gain may result from the operation of the medical school goes to the owners of the property. While the evidence shows a great deal of charity work is performed in the treatment of patients and in dispensing medicines, still the institution is conducted for profit. As it is operated for gain, no part of it is exempt from taxation." It will thus be seen that the infirmary was a mere incident to the medical college, and that the profits were not devoted to charity, but to private ownership.

In the case under consideration, however, the profits arising from the management of the hospital must be expended for charitable purposes, and not for the private benefit of the physicians in charge thereof.

Judgment reversed.

MR. ASSOCIATE JUSTICE HYDRICK, and CIRCUIT JUDGES PRINCE, MEMMINGER, DEVORE, SHIPP, FRANK B. GARY, SPAIN and MOORE concur in the opinion announced by the Chief Justice.

MR. JUSTICE FRASER, *dissenting.* This is an action for damages for personal injury. The plaintiff was suffering from appendicitis and under the advice of her physician, she went to the defendant hospital where the operation was to be

performed by her own physician, under whose advice she
went to the hospital. After the operation, and while the
plaintiff was still unconscious from the effects of the anæs-
thetic, she was turned over to a hospital nurse and put to bed
in the hospital. As the plaintiff began to regain conscious-
ness, she complained of burning up. The plaintiff's mother
was with her and asked the nurse the cause of her daughter's
complaint. The nurse replied that the plaintiff was suffer-
ing from the effects of the anæsthetic only, and nothing was
wrong. The complaints continued and the mother investi-
gated the matter and found that the hot water bottles had
not been removed from the bed, where they had been put to
warm the bed to prevent shock from a cold bed. The plain-
tiff was seriously burned. She was kept at the hospital for
several weeks on account of the injury and claims to have
suffered for a considerable time thereafter.

While there was a conflict of testimony as to the extent of
the injury, there is no dispute as to the fact of injury or
that it was negligence to leave the hot water bottles in the
bed and put the plaintiff upon them.

The defense is that the defendant is an eleemosynary or
charitable corporation, and, as such, is not liable in damages
for the negligence of its employees.

It seems that some worthy and charitable ladies in Colum-
bia some years ago established this hospital. That dona-
tions were received from several sources. Later the medi-
cal association took charge of the hospital under an agree-
ment with the ladies. The ladies retain certain free beds.
The city sends its charity patients there. There are three
classes of patients received: a. Charity patients who, them-
selves, pay nothing. b. Ward patients, who pay a cheap
rate. 2. Patients who have separate rooms; these pay more.

There is serious question as to whether there are, so far as
the hospital is concerned, any charity patients. The city
pays for its patients, and there was valuable property turned

over to the present management by the ladies for the beds assigned to them; but this question need not obscure the issue.    It is claimed that no patients are turned away because they cannot pay.    The plaintiff chose a ward bed and agreed to pay all that was demanded for a ward bed.    After she left the hospital, she demanded her bill, but it was not furnished.    It is claimed that the payments made by those in the ward beds did not fully meet the expenses of the ward beds, and they are in part, at least, charity patients.    This opinion will consider the broad question presented here: Is a hospital with a charitable foundation liable to patients for injuries caused by the negligence of the employees?

There is no case in this State on the subject, and for authority we must go to other jurisdictions.    We are bound by our own decisions.    We are not bound by the decisions of other States.    They are useful as evidence of what the law is, and the testimony of these expert witnesses is to be estimated, not by their number, but by their weight.    The weight is to be determined by their conformity to well known principles of law.    We have no right to follow these witnesses when their testimony conflicts with well known principles of law, established in our own State.

Here is an association whose servant, it is alleged, has done an injury and done it negligently.    To the question: is the person, association, or corporation whose servant, acting within the scope of his employment, has, in violation of a duty, produced injury to another, liable?    The answer, as a general rule, is: It is liable.    The doctrine *respondeat superior* is familiar and its application wide.    There are exceptions, but that is the rule.    When the question is asked, does this apply to an institution that has a charitable foundation, the answer is not uniform.    The greater number of cases hold that the rule does not apply.    In some of the jurisdictions it is held that the rule does apply and it will take legislative power to exempt them.

It sometimes happens that there are conflicting principles of law that apply, and then it is the province of the Court to say which principle governs the case. Those who hold that a charitable hospital is immune from suits for damages to a patient, caused by the negligence of its employees, do not agree among themselves as to the conflicting principle. I will not discuss the cases separately. Their name is legion.

(a) Some hold that to allow recoveries for damages would be to assist in the destruction of a trust fund, and no Court can permit a destruction of a trust fund. Those who hold this ground of immunity do not agree among themselves, for many of them qualify the statement of immunity with the statement "provided the hospital has not been negligent in the selection of the employees." *Bruce* v. *Central M. E. Church,* 147 Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 160. Others say that, while a hospital is not liable to patients under its care, it is liable to third persons. *Thornton* v. *Franklin Square House,* 200 Mass. 465, 86 N. E. 909, 22 L. R. A. (N. S.) 487. What seems to us to be the inconsistency of these positions prevents us from following them. In the cases of damages for negligence in selecting employees and cases of damages for negligence of the employees, the destruction of the trust fund is the same. How is it a destruction of the trust fund? It is said, here is a trust fund intended for good, and it must be preserved at all hazards. It is a principle of law as well as morals, that men must be just before they are generous. There is no higher or more just principle than that a trust fund shall remedy the evil itself has done, before it attempts to remedy the evils done by others. We cannot follow this.

(b) Some of the cases say that the action should be brought against the trustee, and, when he has paid it, he can be reimbursed out of the trust fund. This needs no comment.

(c) Some cases hold that the exception is based on an implied contract of immunity and make this statement (147

Mich. 230, 110 N. W. 951, 10 L. R. A. (N. S.) 74, 11 Ann. Cas. 159) : "They rest upon the principle, correctly stated in *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 294, 47 C. C. A. 122, 65 L. R. A. 372, viz., that the beneficiary of such charitable trust enters into a contract, whereby he assumes the risk of such torts.    It is not surprising that years should have elapsed before the correct legal principle governing these cases was announced in *Powers* v. *Massachusetts Homeopathic Hospital.*    The discovery of correct legal principles, like the discovery of scientific and social truths, requires time and patient investigation."    That case (the Powers case) held that the contract was implied.    We are told, in effect, that a patient entirely unskilled in legal principles, his body racked with pain, his mind distorted with fever, is held to know, by intuition, the principle of law that the Courts after years of travail have at last produced.    We cannot accept a rule based upon after-discovered reasons. We confess that it is new doctrine to us that a Court will assume an implied contract to relieve against liability for future negligence.

The notes to 23 L. R. A., page 200, tell us that the doctrine of immunity from damage suits originally arose in cases in which hospitals were operated by governmental agencies.    Of course, as a rule, a government is not liable for the negligence of its employees.    If the doctrine had been confined to its original declaration, there would have been no trouble; but, when the exempting circumstance does not exist, the immunity ought not to exist.    The result of these holdings is that, where a small charitable foundation is secured, a hospital may be opened; patients secured, who go there under an invitation that promises skilled physicians, competent trained nurses; advantages promised that cannot be secured at home; then, when the patients are secured, they may be neglected, burned with fire or vitriol, put into beds from which other patients afflicted with contagious, loathsome, and it may be disgraceful diseases have been

taken, and we are told there is no remedy except to sue, it may be, a poor, overworked, broken down, friendless, helpless woman. We are not reflecting on the appellant hospital, we are ready to believe that the injury here was simply one of those acts of inadvertence that sometimes befall the most careful of men and women. The thing to which we protest is the absolute immunity given to all hospitals that can secure a charitable foundation from the most brutal and inhuman treatment of those unfortunate men and women who may be carried (sometimes without their knowledge or consent) within its walls, under an implied contract. It is said the patient is not without remedy—sue the woman.

(d) The income from the pay patients might be set apart to pay a judgment (in this case about $40,000 per annum), but some of the cases hold that the pay patients, when they enter a hospital with a charitable foundation, are really charity patients, and the weekly sum they are required to pay are not payments at all, but contributions to the charity fund. This is brilliant, but is not convincing. We think the first duty of every man and the first call upon every fund is to repair the evil of its own doing, and then the remaining fund or remaining strength may be devoted to charity. It may be said the hospital rules forbid the taking of patients with contagious diseases. The contagious nature of the disease may not be known until too late. If these hospitals are held to be immune, they may break the rule with impunity.

(e) Another reason given is that it is not in accord with public policy to allow these good people to be annoyed by damage suits. They are good people, but the legislature fixes the public policy of a State. The reason for this supposed public policy is not altogether clear. Is the damage suit an evil spirit invented by men to harass soulless corporations and from its evil influence the good are immune? If so, they ought to be abolished altogether. That is not the theory. The theory is that, in a damage suit for simple negligence, the evil of the past is compensated for, and for wil-

fulness, evil for the future is prevented. 32 Cyc., p. 1251, Public Policy. "The term has been said to mean the law of the State whether found in the Constitution, statutes, or judicial records." There is nothing in the Constitution, statutes, or judicial records to warrant immunity. Public policy is not the opinion of a Judge as to what ought or ought not to be. See *Magee* v. *O'Neill,* 19 S. C. 185, 45 Am. Rep. 765. The legislature of this State has in recent years passed several acts that remove the immunity from governmental agencies, such as cities and counties, and require them to respond in damages for injuries caused by the negligence of their employees. We cannot, therefore, say that it is against the public policy of this State to require the wrongdoer to pay damages caused by the negligence of employees. The foundation of the original doctrine has been destroyed in the State, and this offspring ought to die with it. The rule is clear and certain that, if a physician undertakes to attend a patient through charity, he is bound to exercise due care and skill and is responsible for negligence. If, however, several combine and subscribe a fund and call it charity (more convenient still, if, as here, some one else will furnish the money), it shall cover a multitude of sins, and it makes no difference what happens, there are only two remedies. One is to close up the place as a public nuisance, and the other is to sue the woman. Neither of these is a remedy.

(f) If the proviso "that they shall not be negligent in the selection of the employees" be law, then the use of the undergraduate as a nurse, to whose skill the school is unwilling to certify in a diploma, may be conclusive evidence of negligence. The proviso is mere dictum and binds no one. The conflict between the doctrine of immunity and proviso is patent. Both cannot stand.

(g) We are told that they have an arrangement with the city to care for its poor. The hospital is not under the control of the city. The city might make an arrangement with

a purely private institution. There is some dangerously broad language in the statute as to municipal responsibility for negligence in things under the control of the city, and little help can be derived from this association.

One of the Courts that denied immunity said that, in the administration of the trust, acts of negligence are as sure as that its administration should be committed to human hands, and it is not too much to suppose that a right-minded donor should be held to have had in contemplation the general rule as to responsibility for its results. Compare that statement with the doctrine of an implied contract of releases from liability for future negligence, and it seems to us that the weight of authority is with those few who assert liability, and not with those who assert immunity.

Courts ought to follow established rules and not destroy them with unwholesome exceptions. Courts ought not to legislate, but, if they must, then their legislation should be wise and safe. We do not think it wise or safe to allow an institution to exist, with unlimited power to do evil and make that institution powerless to repair the evil, because some good man or woman has contributed a fund and intended thereby to do good. We ought to see clearly the result of what we do. If the Courts can take no part of the corpus or income to repair the evil that may be done, neither can the trustees. It would be a breach of trust for them, if the Courts so hold. There has never been a time when the world was subject to such rapid and fundamental changes in the art of healing as today. Truly the wisdom of yesterday has become the foolishness of today. It has not been long since the sick were told to stay out of the night air, because the night air was deadly. Today the sick are told to sleep in the night air, because the night air is life-giving. Neither the constitution of man nor the constituent elements of the night air have changed. Every new doctrine has its believers. There are those who believe in the inerrancy of the wise men of today, and have blind faith in the latest

nostrum. There are those who have aggressive disbelief in all things human, and believe that in the prayer of faith alone is there healing power. May the devotees of either extreme erect their hospitals, the one to remove from the human body every organ they do not understand and choose to call the "mistakes of nature," the other to throw their patients upon a bed and leave them to suffer and to die while they pray, ignoring the revelation that "faith without work is dead," and the Courts are powerless to repair the evil done? There may be unbounded funds from which some reparation may be made. Is there no way to make it? We think there is. We think the Courts ought to hold the fund, first to repair the evil done by itself, because the purpose of the trust is to do good and not evil. We know a trust fund cannot be diverted to a different purpose from that for which it was created. That is established law and we want to further the purpose of the trust. The purpose of the trust is to relieve suffering, and not to increase it, when, in the administration of the trust, suffering is increased, the purpose fails. The Courts that declare immunity are destroying and not maintaining the trust.

MR. JUSTICE WATTS and CIRCUIT JUDGES WILSON, BOW-MAN and RICE concur in the dissenting opinion of Mr. Justice Fraser.

MR. JUSTICE GAGE, *also dissenting.* I concur with Mr. Justice Fraser and Mr. Justice Watts.

Respondent concedes that the defendant is an eleemosynary institution, whatever that may mean; but denies that it is a charity, as that word has been best expounded.

There is no doubt about the rule laid down generally by the Courts, that a charity is not liable for a tort.

That rule was promulgated when charities were rare and were small and were real and it sprang out of the tenderness of the Judges for those who devoted their unrequited energies to the service of humanity; for them, the Judges

thought, the hard rules of legal liability ought to be relaxed. And for a real charity, that ought to be the rule everywhere. But things have changed; today there are hospitals all over the State, some of them owned by a single individual, some of them owned by an aggregation of individuals. Those who have eyes and ears know this to be true.

It is safe to assume that not one of them has a capital stock, and not one of them pays a dividend as such.

If an individual doctor working in his own hospital should injure a patient like the plaintiff was injured he would be liable to suit.

In the case at bar the hospital may have started, and been for years managed, much like a genuine charity.

The elect women of Columbia built it, and equipped it, and started it going for pure love. They then turned it over to a number of doctors to manage according to their own notions, and "because it had become burdensome to them." At the time of this injury the hospital was controlled by twenty-five doctors of Columbia; its income was about $45,000, of which Columbia contributed $3,600; it had generally fifty patients, and could hold no more; it charged well nigh all who came, except there were some free beds.

There is nothing about the entire business as managed to differentiate it from the hospital of those gentlemen who undertake to manage a hospital single handed, except the ladies donated this hospital to the doctors and the city of Columbia appropriates $3,600 a year to keep it going.

The same rule of liability ought therefore to apply to all persons like circumstanced, and that is the rule of liability for wrong conduct, whether done by one's self or through one's agent.

It may be the plaintiff shall not be able to collect her judgment; but "we have no right to proceed on the theory that if, at the end of the litigation, plaintiff establishes her right to damages, the judgment would not be paid." *Hopkins* v.

*Clemson Agricultural College of South Carolina,* 221 U. S. 648, 31 Sup. Ct. 658, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243.

I see no reason to change my opinion. The brick and mortar of the trust may not be liable to pay the judgment; but the funds are.